David S. Kahn
Nevada Bar No. 007038
J. Scott Burris
Nevada Bar No. 010529
Juan P. Rodriguez
Nevada Bar No. 010733
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
300 South Fourth Street, 11th Floor
Las Vegas, NV  89101
(702) 727-1400; FAX (702) 727-1401
E-mail:  David.Kahn@wilsonelser.com
          J.Scott.Burris@wilsonelser.com
          Juan.Rodriguez@wilsonelser.com

Stephen M. Gaffigan (*Pro Hac Vice* pending)
STEPHEN M. GAFFIGAN, P.A.
401 East Las Olas Blvd., Suite 130-453
Ft. Lauderdale, Florida 33301
Telephone: (954) 767-4819
Facsimile: (954) 767-4821
E-mail:  stephen@smgpa.net

*Attorneys for Plaintiff TIFFANY (NJ), LLC.*

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| TIFFANY (NJ), LLC, | ) | Case No. |
|    Plaintiff, | ) | |
| | ) | **MEMORANDUM OF POINTS AND** |
| v. | ) | **AUTHORITIES IN SUPPORT OF** |
| | ) | **PLAINTIFF'S *EX PARTE* APPLICATION** |
| THE PARTNERSHIPS and | ) | **FOR ENTRY OF TEMPORARY** |
| UNINCORPORATED ASSOCIATIONS | ) | **RESTRAINING ORDER AND** |
| IDENTIFIED ON SCHEDULE "A" and | ) | **PRELIMINARY INJUNCTION** |
| DOES 1-1000, | ) | |
|    Defendants. | ) | |
| | ) | |
| | ) | |

   Plaintiff submits this Memorandum of Points and Authorities in support of its *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction (the "*Ex Parte* Application").

1

## I.   INTRODUCTION AND CLAIMS

Plaintiff Tiffany (NJ), LLC ("Plaintiff" or "Tiffany") is suing Defendants, The Partnerships and Unincorporated Associations indentified on Schedule "A" to Plaintiff's *Ex Parte* Application and Does 1-1,000 (collectively "Defendants"), for federal trademark infringement and counterfeiting, false designation of origin, cyberpiracy, and common law unfair competition. As alleged in Tiffany's Complaint, Defendants are promoting, advertising, distributing, offering for sale and selling counterfeit products, including at least jewelry, such as bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes (the "Defendants' Goods") bearing trademarks which are exact copies of Tiffany's registered trademarks, through various fully interactive commercial Internet websites operating under their partnership and/or business association names (the "Subject Domain Names").

Defendants' unlawful activities have caused and will continue to cause irreparable injury to Tiffany. Among other things, Defendants have (1) deprived Tiffany of its right to determine the manner in which its trademarks are presented to the public through merchandising; (2) defrauded the public into thinking Defendants' Goods are valuable, authorized goods of Tiffany; (3) deceived the public as to Tiffany's sponsorship of and/or association with Defendants' Goods and the websites through which such goods are marketed and sold; (4) wrongfully traded and capitalized on Tiffany's reputation and goodwill and the commercial value of Tiffany's trademarks; and (5) wrongfully damaged Tiffany's ability to market its goods and educate consumers about its brand via the Internet in a free and fair marketplace. Defendants should not be permitted continue their unlawful activities and should be enjoined.

## II.   STATEMENT OF FACTS

### A.   Tiffany's Rights

Tiffany is, and at all times relevant hereto has been, the owner and/or exclusive licensee in and to the following federally registered trademarks:

| Trademark | Registration No. | Registration Date |
|---|---|---|
| TIFFANY & CO | 0,023,573 | September 5, 1893 |

2

| | | |
|---|---|---|
| Tiffany | 0,133,063 | July 6, 1920 |
| TIFFANY & CO. | 1,228,189 | February 22, 1983 |
| TIFFANY | 1,228,409 | February 22, 1983 |
| TIFFANY & CO. | 1,283,306 | June 26, 1984 |
| ATLAS | 1,605,467 | July 10, 1990 |
| T & CO. | 1,669,365 | December 24, 1991 |
|  | 1,785,204 | August 3, 1993 |
| PERETTI | 1,787,861 | August 17, 1993 |
| ELSA PERETTI | 1,799,272 | October 19, 1993 |
|  | 1,804,353 | November 16, 1993 |
| TIFFANY & CO. | 1,968,614 | April 16, 1996 |
|  | 2,184,128 | August 25, 1998 |
|  | 2,359,351 | June 20, 2000 |
| TIFFANY | 2,639,539 | October 22, 2002 |
| ATLAS | 2,886,655 | September 21, 2004 |

(the "Tiffany Marks") which are registered in International Classes 14 and 21, and are used in connection with the manufacture and distribution of, among other things, high quality jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes. (Declaration of Steven Costello in Support of Plaintiff's *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction ["Costello Decl."] ¶ 4, filed herewith; see also United States Trademark Registrations for the Tiffany Marks at issue ["Tiffany Trademark Registrations"] attached as Exhibit A to the Costello Decl.) The Tiffany Marks are symbols of Tiffany's quality, reputation, and goodwill and have never been abandoned. (Costello Decl. ¶ 7.) Moreover, Tiffany has expended substantial time, money, and other resources developing, advertising, and otherwise promoting its trademarks. (Costello Decl. ¶¶ 6-7.) Accordingly, the Tiffany Marks qualify as famous marks as the term is used in 15 U.S.C. § 1125(c)(1). (Costello Decl. ¶¶ 6-7)

3

Furthermore, Tiffany has extensively used, advertised, and promoted its Marks in the United States in association with jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes, and related goods, and has carefully monitored and policed the use of its Tiffany Marks. (Costello Decl. ¶ 7.)  As a result of Tiffany's efforts, members of the consuming public readily identify products bearing the Tiffany Marks as being quality merchandise sponsored and approved by Tiffany and the Marks have achieved secondary meaning as identifies of high quality products. (Costello Decl. ¶ 7.)

At all times relevant hereto, Defendants have been aware of Tiffany's (a) ownership of the Tiffany Marks; (b) exclusive rights to use and license such Marks; and (c) substantial goodwill embodied in, and favorable recognition for, the Tiffany Marks for jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes.

**B.      Defendants Wrongfully Use the Tiffany Trademarks in Connection With the Promotion and Sale of Counterfeit Goods.**

Defendants do not have, nor have they ever had, the right or authority to use the Tiffany Marks for any purpose. (Costello Decl. ¶ 9.) However, despite their known lack of authority to do so, Defendants have been advertising, offering for sale, and/or selling at least jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes, bearing counterfeit and infringing marks which are identical to the registered Tiffany Marks. (Costello Decl. ¶¶ 9-15 and Composite Exhibit B attached thereto, relevant web page captures from Defendants' Internet websites operating under the Subject Domain Names displaying the Tiffany branded items offered for sale ["Defendants' Websites"]; Declaration of Brandon Tanori in Support of Plaintiff's *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction ["Tanori Decl."] ¶ 4 and Composite Exhibit A attached thereto, relevant web page captures reflecting Tiffany branded items purchased from Defendants.) Moreover, given Defendants' slavish copying of the Tiffany Marks, overall design, color scheme, and products, genuine goods bearing the Tiffany Marks and Defendants' Goods sold under identical marks are indistinguishable to consumers at the point of sale and post-sale.

4

As part of its ongoing investigation regarding the sale of counterfeit products, Tiffany retained Brandon Tanori of Investigative Consultants, to investigate the sale of counterfeit Tiffany branded products by Defendants. (Costello Decl. ¶ 10; Tanori Decl. ¶ 3.) Tanori accessed Defendants' fully interactive commercial Internet websites operating under the Subject Domain Names brandtiffany.com, faketiffany.org, goldtiffanyjewelry.com, mirrorjewelry.com, myfaketiffany.com, replicatiffany.net, tiffanyforu.com, tiffanyo.com, and top1tiffany.com, and placed orders for the purchase of various Tiffany branded products. (Tanori Decl. ¶ 4 and Composite Exhibit A thereto.) The detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori from Defendants' websites were inspected by Tiffany's representative, Steven Costello, who determined the products to be non-genuine Tiffany products. (Costello Decl. ¶¶ 11-12.) Mr. Costello also reviewed and visually inspected Defendants' Websites, as well as items bearing the Tiffany Marks offered for sale by Defendants via their Internet websites operating under the Subject Domain Names, and likewise determined the products were not genuine Tiffany goods. (Costello Decl. ¶¶ 13-15 and Composite Exhibit C thereto, summary comparison table illustrating examples of Defendants' infringement of the Tiffany Marks.)

Section 1127 of the Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Also, using the "ocular test" of direct comparison, courts have found that even marks which are slightly modified from the registered marks copied are to be considered counterfeit marks. See Fimab-Finanziaria Maglificio vs. Helio Import/Export, Inc., 601 F. Supp. 1 (S.D. Fla. 1983). A comparison of the Tiffany Marks at issue to the marks used by Defendants in connection with the sale of Defendants' Goods reveals the obvious counterfeit nature of Defendants' Goods. (Compare Tiffany's Trademarks Registrations [Exhibit A to the Costello Decl.] with Defendants' Websites [Composite Exhibit B to the Costello Decl.] and the detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori [Composite Exhibit A to Tanori Decl.].) Defendants' Goods bearing counterfeits of the Tiffany Marks are being promoted, advertised, offered for sale and sold by Defendants to consumers in this Judicial District and throughout the

United States. (Tanori Declaration ¶ 4 and Composite Exhibit A attached thereto; Costello Decl. ¶¶ 11-15 and Composite Exhibit B attached thereto, Defendants' Websites.)  Defendants are making substantial sums of money by preying upon their purchasers and members of the general public, many of whom have no knowledge Defendants are defrauding them through the sale of worthless counterfeit goods. Defendants are also falsely representing to consumers and the trade that their counterfeit goods are genuine, authentic, endorsed, and authorized by Tiffany. Ultimately, Defendants' Internet-based websites amount to nothing more than massive illegal operations infringing on the intellectual property rights of Tiffany and others. The Subject Domain Names are used as the common names of Defendants and are themselves a substantial part of the means by which Defendants further their scheme and cause harm to Tiffany.

### C.    Defendants Unfairly Compete with Tiffany Through Search Engine Optimization Strategies Using Counterfeits of the Tiffany Marks.

Genuine Tiffany branded goods are widely legitimately advertised, promoted, offered for sale and discussed by Tiffany, its authorized distributors and unrelated third parties via the Internet. (Costello Decl. ¶ 16.)  Over the course of the past five years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo! and Bing, has become increasingly important to Tiffany's overall marketing and consumer education efforts. (Costello Decl. ¶ 17.) Thus, Tiffany expends significant monetary resources on Internet marketing and consumer education regarding its products, including search engine optimization ("SEO") strategies, which allow Tiffany, its authorized accounts and others to fairly educate consumers about the value associated with the Tiffany brand and the goods sold thereunder.  (Id.)

SEO is a now common marketing process whereby a company or individual legitimately designs, supports, structures and phrases Internet content in order to enhance a website's profile for search engines over a variety of search terms. SEO essentially describes the process of steps undertaken by a website owner to ensure that, in response to a specific search phrase or phrases, the owner's website appears in the results returned by an Internet search engine such as Google, Yahoo! or Bing. According to one estimate, in 2008, advertisers spent approximately eleven billion dollars

6

1    on advertising with search engines, reflecting the sheer economic power of the industry. As a result,

2    the SEO industry has arisen to assist website owners in improving their rankings in search engine

3    results, thereby essentially securing search engines' role as a gatekeeper and driver of the online

4    economy.[1]

5          The rise of the importance of SEO marketing practices has not been lost on those, such as

6    Defendants herein, engaged in the illegal business of selling counterfeit branded goods. To the

7    contrary, counterfeiters, such as Defendants, have embraced the SEO concept and are concurrently

8    leveraging it to cause greater and more significant harm to brand owners, including Tiffany. By their

9    combined actions, Defendants are causing concurrent and indivisible harm to Tiffany by (i)

10   depriving Tiffany, its authorized distributors and other non-infringing third parties (Example:

11   Tiffany fan websites) of the ability to fairly compete for space within search engine results, (ii)

12   causing an overall degradation of the value of the goodwill associated with the Tiffany Marks, and

13   (iii) unjustly increasing Tiffany's overall cost to market its brand, its goods and educate consumers

14   about its products via the Internet. (Costello Decl. ¶¶ 17-18.)  Defendants, each of whom is aware of

15   the activities of the others, are combining the force of their actions in order to cause concurrent and

16   indivisible harm to Tiffany, its authorized retailers and consumers. (Costello Decl. ¶¶ 18-19.) By

17   engaging in SEO strategies based upon an illegal use of the Tiffany Marks, Defendants are

18   obliterating the otherwise open and available marketplace space in which Tiffany has the right to

19   fairly market its goods and associated message. Specifically, Defendants use unauthorized

20   counterfeits of Tiffany's name and trademarks within the content, anchor text and/or meta tags of

21   their websites in order to attract the automated eye of various search engines crawling the Internet

22   looking for websites relevant to consumer searches for Tiffany related goods and information.

23   (Costello Decl. ¶ 18.)  Meaningful search engine results page space is akin to real estate – there is

24   only so much of it available. Thus, website operators such as Tiffany and Defendants spend

25   substantial sums of money incorporating concepts and popular search terms, such as the Tiffany

26   _____

27   [1] Viva R. Moffat, Regulating Search, 22 Harv. J.L. & Tech. 475, 481-82 (Spring, 2009) (footnotes

28   omitted).

7

Marks, into their website content in order to be seen by the search engines and returned as part of relevant search results across an array of search phrases. (Costello Decl. ¶¶ 17-18.)  The primary difference between what Tiffany and Defendants are doing, of course, is that Tiffany is doing so through the legal use of its trademarks in which it has made a substantial economic investment and Defendants are doing so through subterfuge and illegal behavior, including the counterfeiting of the Tiffany Marks.

For purposes of this Motion, Tiffany does not contend that it or any other third party has the exclusive right to appear in any particular location in the results of any search engine across any particular array of search terms. However, Tiffany does contend that it has the right to fairly compete for such search engine results space unfettered by unfair competition stemming from an illegal use of Tiffany's trademarks. Tiffany's right to fairly compete for the best Internet real estate and its reputation are being trampled by the combined efforts of Defendants. In short, Tiffany, its trademark rights and associated goodwill are suffering death by 1,000 cuts. While each Defendants actions alone cause harm to Tiffany, the combined force and effect of Defendants' overall actions is causing the single indivisible harm of the erosion of the goodwill associated with the Tiffany Marks and the denial of Tiffany's right to fairly compete in the Internet marketplace reflected in search engine results.

By way of example and not limitation, attached Composite Exhibit A to the Declaration of Stephen M. Gaffigan in Support of Plaintiff's *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction ("Gaffigan Decl."), are the top fifty (50) most recent Google (United States) search engine results across the search phrases: (1) Tiffany; (2) Tiffany Replica; (3) Tiffany Replica Jewelry; (4) Tiffany Jewelry; (5) Tiffany Jewelry Outlet; (6) Tiffany Jewelry Imitation; (7) Tiffany Jewelry On Sale; (8) Tiffany Jewelry Sale; (9) Sale Tiffany Jewelry; (10) Tiffany Jewelry For Sale; (11) Cheap Tiffany Jewelry; (12) Tiffany Jewelry Wholesale; (13) Wholesale Tiffany Jewelry; (14) Tiffany Jewelry Cheap; (15) Faux Tiffany Jewelry; (16) Inexpensive Tiffany Jewelry; (17) Cheapest Tiffany Jewelry; (18)  Tiffany Jewelry For Cheap; (19) Discount Tiffany Jewelry; (20) Discounted Tiffany Jewelry; (21) Tiffany Jewelry Discount; (22)

8

Silver Tiffany Jewelry; (23) Tiffany Jewelry Silver; (24) Inspired Tiffany Jewelry; and (25) Tiffany Jewelry Stores. Of the total five hundred forty-nine (516) unique[2] websites returned by Google within these search ranges, two hundred twenty-three (223) of them pertain to the sale of goods using or bearing counterfeits of the Tiffany Marks.[3] (Gaffigan Decl. ¶ 3.) In all cases, Tiffany's message to consumers is surrounded, and in many cases, trumped by counterfeit websites which can only result in consumer confusion, particularly given the similarity of the goods offered for sale on most of the websites. For example, the searches for "Tiffany Jewelry Outlet", "Tiffany Jewelry Wholesale" and "Wholesale Tiffany Jewelry" deliver four, six, and six, websites, respectively, offering for sale replica Tiffany branded goods as results for each above legitimate Tiffany websites optimized for the same search phrase. (See Composite Exhibit A to Gaffigan Decl. at pp. 32-39, 84-97.) Those websites sell counterfeit Tiffany branded goods but, their proximity in the search results to the Tiffany's company owned websites result, will undoubtedly suggest to consumers that they are authorized by Tiffany. Moreover, a number of Tiffany's consumer education websites actually appear much lower in the search results than many websites using counterfeits of the Tiffany Marks. (See Composite Exhibit A to the Gaffigan Decl.)

## III.   **ARGUMENT**

### A.   **A Temporary Restraining Order is Essential to Prevent Immediate Injury.**

Rule 65(b) of the Federal Rules of Civil Procedure provides, in part, that a temporary restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." This is such a case.

---

[2] Given the similar nature of the search terms used, the results returned included many duplicates. These duplicates are the result of some websites being optimized for multiple search terms.

[3] An additional twelve (12) returned domain names are either infringing websites which are the subject of other pending litigations or formerly hosted counterfeit websites, but were transferred to Tiffany pursuant to judgments in prior litigations. The transferred websites are currently being used by Tiffany to educate consumers about Tiffany's efforts to stamp out Internet counterfeiting. Several more of the websites appearing are third parties who are engaged in non-infringing business or commentary.

Defendants herein fraudulently promote, advertise, offer to sell and sell substantial quantities of goods bearing counterfeits of the Tiffany Marks via the Internet websites operating under at least the Subject Domain Names. By their actions, Defendants are creating a false association in the minds of consumers between Defendants and Tiffany. Specifically, Defendants are wrongfully using counterfeits of the Tiffany Marks to promote and attract customers to their website businesses. Counterfeits of the Tiffany Marks are being used by Defendants to increase traffic to their illegal businesses which offer consumers a variety of counterfeit goods, including Tiffany branded goods. The entry of a temporary restraining order would serve to immediately stop Defendants from benefiting from their wrongful use of the Tiffany Marks and preserve the status quo until such time as a hearing can be held. Thus, a temporary restraining order is appropriate. In re Vuitton et Fils, S.A., 606 F.2d 1 (2d Cir. 1979) (holding that *ex parte* temporary restraining orders are indispensable to the commencement of an action when they are the sole method of preserving a state of affairs in which the court can provide effective final relief).

In the absence of a temporary restraining order without notice, Defendants can and, based upon Tiffany's past experience, will significantly alter the status quo before the Court can determine the parties' respective rights. Specifically, the Internet websites at issue are under the complete control of Defendants. Thus, Defendants have the ability to modify registration data and content, change hosts and, most importantly, redirect traffic to other websites they control. (Gaffigan Decl. ¶ 5.) All of these things can literally happen in the span of a few seconds after Defendants are provided with notice of this action. (Id.) Moreover, Defendants operate Internet websites which they optimize for the sale of counterfeit Tiffany merchandise. The optimization process provides Defendants with their power to unfairly compete with Tiffany by catapulting their illegal websites into search engine results. All of that optimization power which has been built through the illegal use of the Tiffany Marks can easily be transferred to a new domain name in a matter of minutes through what is known as a redirect. (Gaffigan Decl. ¶¶ 6-7.) Tiffany's counsel has learned through multiple prior cases that, upon notice of a lawsuit, counterfeit website owners typically immediately set up a redirect, which essentially informs a search engine that the website being crawled has permanently

10

moved to another domain and instructs the search engine to divert traffic to the other website. (Id.) In the circumstances present in this case, Defendants could use a redirect to push new traffic from the Subject Domain Names to new domains not yet identified in the Complaint. The result would be to slingshot the new domains to the top of the search engine results pages by leveraging the Internet traffic to the domains in suit which was built through the illegal use of the Tiffany Marks. In short, Defendants would completely erase the status quo by transferring all of the benefits of their prior illegal activities to new websites. Tiffany's counsel has seen this precise pattern of behavior occur in a number of prior cases after Defendants therein learned of a lawsuit requesting transfer of their domain names. (Gaffigan Decl. ¶ 7 and Composite Exhibit C attached thereto.)

Moreover, federal courts have long recognized that civil actions against counterfeiters – whose very business is built around the deliberate misappropriation of rights and property belonging to others – present special challenges that justify proceeding on an *ex parte* basis. Time Warner Enter. Co. v. Does #1-2, 876 F. Supp. 407. 410-11 (E.D.N.Y. 1994); see also Columbia Pictures Indus., Inc. v. Jasso, 927 F. Supp 1075, 1077 (N.D. Ill. 1996) (observing that "proceedings against those who deliberately traffic in infringing merchandise are often useless if notice is given to the infringers").[4] This Court should prevent an injustice from occurring by issuing an *ex parte* temporary restraining order which precludes Defendants from continuing to display their infringing content via the websites operating under the Subject Domain Names and which temporarily removes control over the websites from Defendants. Only such an order will prevent ongoing irreparable harm and maintain the status quo.

**B.      Standard for Temporary Restraining Order and Preliminary Injunction.**

The standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are the same. Quiroga v. Chen, 735 F. Supp. 2d 1226, 1228 (D. Nev. 2010) (citing Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc., 181 F. Supp. 2d 1111, 1126

---

[4] See also Chanel, Inc. v. Qi, Case No. 3:11-cv-00362-CRB (N.D. Cal. Jan. 27, 2011 (Order granting *Ex Parte* Application for Temporary Restraining Order); Affliction Holdings, LLC, Inc. v. Chen, Case No. 10-cv-00933-VRW (N.D. Cal. March 15, 2010) (same); Chanel, Inc. v. Paley, Case No. 09-cv-04979-MHP (N.D. Cal. Oct. 26, 2009) (same); Chanel, Inc. v. Dodd, Case No. 09-3958-VRW (N.D. Cal. Sept. 4, 2009) (same).

(E.D. Cal. 2001)). In order to obtain an injunction in the Ninth Circuit, Plaintiff must establish: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008)). Plaintiff's evidence establishes all of the relevant factors. Accordingly, injunctive relief is appropriate.

### 1.   Probability of Success on the Merits of Tiffany's Claims.

#### a)   Tiffany Will Likely Succeed on its Counterfeiting and Infringement Claim.

Title 15 U.S.C. §1114 provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive." Tiffany must demonstrate (1) ownership of the marks at issue; (2) Defendants' use of the marks is without authorization from Tiffany; and (3) Defendants' use is likely to cause confusion, mistake, or deception as to the source, affiliation, or sponsorship of Defendants' Goods. See 15 U.S.C. § 1114(1). Tiffany's evidence submitted herewith satisfies the three requirements of 15 U.S.C. § 1114.

The first two elements of Tiffany's trademark infringement claim are easily met. The Tiffany Marks are owned by Tiffany and registered on the Principal Register of the Untied Patent and Trademark Office. (Costello Decl. ¶ 4 and Exhibit A attached thereto, Tiffany Trademark Registrations.) Moreover, Defendants do not have, nor have they ever had, the right or authority to use the Tiffany Marks.  (Costello Decl. ¶ 9.)

The Ninth Circuit sets forth eight factors to be weighed in determining the third element, likelihood of confusion.  See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979), abrogated in part on other grounds as stated in Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810, n. 19 (9th Cir. 2003). The eight Sleekcraft factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing

12

channels used; (6) type of goods and degree of care likely to be exercised by a purchaser; (7) defendants' intent in selecting the mark; and (8) likelihood of expansion of the product lines. See also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 608 (9th Cir. 2005). The eight factors listed are to be weighed and balanced and no particular factor is dispositive.

### (1)    Strength of Plaintiff's Mark.

A trademark's strength is determined by viewing the mark in its entirety as it appears in the marketplace. Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1218 (9th Cir. 1987). Hence, although part of a mark may be weak, the mark as a whole may be strong. See Fruit of the Loom, Inc. v. Girouard, 994 F.2d 1359, 1362 (9th Cir. 1993) (noting that although the word "Fruit" was not in and of itself a strong mark, the phrase "Fruit of the Loom" was). The spectrum of protectability and strength for trademarks is divided into four primary types of designations: (1) coined, fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992). Arbitrary or fanciful marks are the strongest. Moreover, arbitrary/fanciful and suggestive marks are deemed inherently distinctive and entitled to protection. (See id.) It cannot be seriously disputed that the Tiffany Marks are strong, arbitrary and fanciful marks. (Costello Decl. ¶¶ 4-7 and Exhibit A attached thereto, Tiffany Trademark Registrations.)

In addition to their inherent strength, the Tiffany Marks have also acquired secondary meaning.[5] Tiffany has expended substantial time, labor, skill, and expense in developing, advertising, and promoting the Tiffany Marks. (Costello Decl. ¶¶ 6-7.) The Tiffany Marks enjoy widespread recognition and are each prominent in the minds of the consuming public. (Costello Decl. ¶ 7.) Indeed, Tiffany products bearing the Tiffany Marks are among the best selling luxury goods in the United States. (Costello Decl. ¶ 6.)

---

[5] All of the Tiffany Registrations are incontestable and therefore conclusively presumed to have secondary meaning. Miss World (UK) Ltd. v. Miss Am. Pageants, Inc., 856 F.2d 1445, 1448, n. 4 (9th Cir. 1988) abrogated on other grounds as recognized in Eclipse Assoc. Ltd. v. Data Gen. Corp., 894 F.2d 1114, 1116, n. 1 (9th Cir. 1990).

13

**(2)      Proximity of the Goods.**

Defendants are selling the same type of goods Tiffany sells, i.e., jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes. (Costello Decl. ¶¶ 4-5 and Composite Exhibit B attached thereto, Defendants' Websites.)  The fact that Defendants are selling the same type of goods as those sold by Tiffany is one of the three most important factors to be considered in the likelihood of confusion analysis.  See GoTo.Com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000) ("related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods") (quoting Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 136 (9th Cir. 1999)).

**(3)      Similarity of the Marks.**

The Ninth Circuit has also expressly stated that similarity of the marks is another of the three most probative factors in the likelihood of confusion analysis.  GoTo.Com, Inc. v. Walt Disney Co., 202 F.3d at 1205.  In the instant case, Defendants are using marks which are identical (visually and phonetically) to the Tiffany Marks. (Compare Tiffany Trademark Registrations [Exhibit A to the Costello Decl.] with Defendants' Websites [attached as Composite Exhibit B to the Costello Decl.] and the detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori [Composite Exhibit A to Tanori Decl.].  See also Composite Exhibit C to the Costello Decl., summary comparison table illustrating examples of Defendants' infringement of the Tiffany Marks.)

**(4)      Evidence of Actual Confusion.**

Actual confusion is unnecessary to establish infringement since the test is likelihood of confusion. Eclipse Assoc. v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990).  Indeed, the Court in Sleekcraft held "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." Sleekcraft, 599 F.2d at 352. In this case, however, it is reasonable to infer actual confusion exists in the marketplace based upon the circumstantial evidence available. Defendants are advertising and offering to sell counterfeit goods identical in appearance to those sold by Tiffany. (See Defendants' Websites attached as Composite Exhibit B to

the Costello Decl. and the detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori Composite Exhibit A to the Tanori Decl.) In some instances, Defendants' Goods are being sold via websites operating under domain names employing the name Tiffany. Even if buyers are told of the bogus nature of Defendants' Goods, other consumers viewing Defendants' Goods in a post-sale setting will obviously be confused, because they are viewing goods bearing the Tiffany Marks which undeniably creates the impression they are viewing genuine goods sold or authorized by Tiffany. Post-sale consumer confusion is ensured by Defendants' exact copying of the Tiffany Marks. Such post-sale confusion is entirely actionable. Abercrombie & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629, 635 (9th Cir. 2007) (citing Karl Storz Endoscopy- Am., Inc. v. Surgical Techs., Inc., 285 F.3d 848, 854 (9th Cir. 2002)).  See also Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc., 944 F.2d 1446, 1455, 19 U.S.P.Q.2d 1491 (9th Cir. 1991) (while purchaser of OSCAR look-alike award would know it is not a genuine OSCAR, "a large secondary audience" of recipients and viewers "might conceivably assume the [Defendant's] Award was somehow associated with the Oscar;" infringement found).

### (5)    Marketing Channels Used.

Convergent marketing channels increase the likelihood of confusion. Sleekcraft, 599 F.2d at 353. Both Tiffany and Defendants sell, distribute, and advertise their products using at least one of the same marketing channels, the Internet, in the same geographical distribution areas, including the United States. (Costello Decl. ¶¶ 5-6; Tanori Decl. ¶ 4; and Defendants' Websites attached as Composite Exhibit B to the Costello Decl.) Thus the conditions of purchase for both parties are unmistakably identical. Moreover, both target the same general customers, and as such, Tiffany is directly competing with Defendants' Goods.

### (6)    Type of Goods and Degree of Care Likely to Be Exercised By Purchaser.

The standard used by courts in assessing the likelihood of confusion of the public is not of an expert, but rather the "typical buyer exercising ordinary caution." Sleekcraft 599 F.2d at 353. When reviewing this factor, the most important consideration is generally price. Consumer confusion is

15

likely to occur from paying similar prices for counterfeit goods, because consumers may reasonably suspect that those goods have a common origin or that they are someway related to the genuine goods. Although consumers are generally expected to be more careful when selecting goods at high prices, see e.g., Nova Wines, Inc. v. Adler Fels Winery, LLC, 467 F. Supp. 2d 965, 981 (N.D. Cal. 2006), the law is nevertheless designed to protect the purchasing public, including "the ignorant, the inexperienced, and the gullible." Stork Rest. v. Sahati, 166 F.2d 348, 359 (9th Cir. 1948); Florence Mfg. Co. v. J.C. Dowd & Co., 178 F. 73 (2d Cir. 1910) (stating that the law protects "the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions.").

Despite the fact that Defendants' counterfeit goods are priced lower than genuine Tiffany goods, even a detailed analysis of Defendants' finished counterfeit products by a consumer in a post-sale setting may not reveal they are distinguishable from Tiffany's genuine goods, since the counterfeit trademarks being used by Defendants are identical to the Tiffany Marks. (Compare Tiffany Trademark Registrations [Exhibit A to the Costello Decl.] with Defendants' Websites [attached as Composite Exhibit B to the Costello Decl.] and the detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori [Composite Exhibit A to Tanori Decl.].)

### (7)   Defendants' Intent in Selecting the Marks.

The Ninth Circuit has held that "[w]hen an alleged infringer knowingly adopts a Mark similar to another's, courts will presume an intent to deceive the public." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993). See also E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir. 1992). In a case of clear-cut copying such as this, it is appropriate to infer Defendants intended to benefit from Tiffany's reputation, to the detriment of Tiffany. See Interstellar Starship Serv. Ltd. v. Epix, Inc., 184 F.3d 1107, 1111 (9th Cir. 1999), cert. denied, 528 U.S. 1155, 120 S. Ct. 1161, 145 L. Ed.2d 1073 (2000) ("Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive. [...] In turn, intent to deceive is strong evidence of a likelihood of confusion."). See also Acad. of Motion Picture Arts & Scis., 944

16

F.2d at 1456. Defendants obviously adopted the Tiffany Marks with the intention of reaping the benefits of Tiffany's world-famous reputation and for the purpose of defrauding the public. In fact, many of Defendants' websites contain open admissions that the goods offered for sale thereon are "replica," "knockoff" and/or "fake." (See generally, Composite Exhibit B to Costello Decl.) Hence, Defendants cannot seriously contend they did not intend to reap the benefits of Tiffany's world-famous reputations for the purpose of defrauding the public. At a bare minimum, Defendants acted with willful blindness or with reckless disregard for Tiffany's trademark rights. See Microsoft Corp. v. E & M Internet Bookstore, Inc., 2008 WL 191346, at *3 (N.D. Cal. 2008) (trademark infringement can be deemed willful where Defendants acted with "willful blindness.") Defendants cannot seriously contend they did not intend to reap the benefits of Tiffany's world-famous reputation for the purpose of defrauding the public.

### (8)   Likelihood of Expansion of the Product Lines.

Tiffany already distributes goods, specifically jewelry, including bracelets, necklaces, pendants, earrings and rings, cufflinks, money clips, key rings, watches, and gift boxes, which are virtually identical, except in quality, to those being sold and offered for sale by Defendants. (See Tiffany Trademark Registrations [Exhibit A to the Costello Decl.] with Defendants' Websites [attached as Composite Exhibit B to the Costello Decl.] and the detailed webpage listings and images of the Tiffany branded goods purchased by Investigator Tanori [Composite Exhibit A to Tanori Decl.].) Since Defendants are already directly competing with Tiffany by selling the aforementioned counterfeit goods, analysis of this factor is unnecessary. See Nova Wines, 467 F. Supp. 2d at 982.

It is abundantly clear the eight (8) Sleekcraft factors weigh overwhelmingly in Tiffany's favor. Tiffany has, therefore, shown a probability of success on the merits of its trademark counterfeiting and infringement claim.

### b)   Tiffany is Likely to Succeed on its False Designation of Origin Claim.

As with trademark infringement claims, the test for liability for false designation of origin

under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is also whether the public is likely to be deceived or confused by the similarity of the marks at issue. Smith v. Chanel, Inc., 402 F.2d 562, 565 (9th Cir. 1968). As noted by the Ninth Circuit, "[w]hether we call the violation infringement, unfair competition or false designation of origin, the test is identical "is there a 'likelihood of confusion?'" New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1201 (9th Cir. 1979). See also ACI Int'l Inc. v. Adidas- Salomon AG, 359 F. Supp. 2d 918, 921 (C.D. Cal. 2005) ("The ultimate test for unfair competition is exactly the same as for federal trademark infringement."). Therefore, because Tiffany has established the merits of its trademark counterfeiting and infringement claims against Defendants, a likelihood of success is also shown as to Tiffany's federal false designation of origin pursuant to Section 43(a) of the Lanham Act.

### c)   Tiffany is Likely to Succeed on its Cyberpiracy Claim.

The Anticybersquatting Consumer Protect Act ("ACPA") protects the owner of a distinctive or famous trademark from another's bad faith intent to profit from the trademark owner's mark by registering or using a domain name which is identical or confusingly similar to, or dilutive of, the trademark owner's mark without regard to the goods or services of the parties. 15 U.S.C. § 1125(d). To prevail under 15 U.S.C. § 1125(d), a plaintiff must prove that a defendant "(1) registers, uses, or traffics in a domain name, that (2) is identical or confusingly similar to a distinctive or famous trademark, with (3) bad faith intent to profit from the trademark." Verizon California Inc. v. OnlineNIC Inc., 2008 WL 5352022, at *2 (N.D. Cal. 2008). See 15 U.S.C. § 1125(d). Tiffany's evidence submitted herewith satisfies the requirements of 15 U.S.C. § 1125(d).

Defendants have registered at least one hundred thirty (130) domain names, which are nearly identical and/or confusingly similar to several of the Tiffany Marks at issue.[6] The domain names

---

[6] Specifically, the pirated domain names are: 925tiffany.com, 925tiffany.net, alltiffanyjewelry.com, australiatiffanystore.com, autiffany4sale.com, bestbuytiffany.com, better-tiffany.com, brandtiffany.com, buy-tiffanyjewelry.com, canadatiffanystore.com, casualtiffany.com, cheaptiffanyjewelry.com, cheaptiffanys.com, cooltiffany.com, designertiffanyjewelry.org, discountiffany.com, discounttiffanyjewelry.us, etiffanybag.com, europeantiffany.com, faketiffany.org, faketiffanyjewelry.org, forsaletiffany.com, goldtiffanyjewelry.com, hot-tiffany.com, ilovetiffany.net, istiffany.com, lovetiffanyjewelry.com, myfaketiffany.com, mytiffanycity.com, mytiffanyonline.com, mytiffanysjewelry.com, mytiffanysonline.com, newtiffany.com, newtiffanys.com, onsaletiffany.com, populartiffany.com, replicatiffany.net, saletiffanyjewelry.org,

18

incorporate several of the "Tiffany" Marks in their entirety surrounded by descriptive or generic terms, rendering the names nearly identical as compared to Tiffany's trademarks. See DaimlerChrysler v. The Net Inc., 388 F.3d 201, 205-06 (6th Cir. 2004) ("Courts generally have held that a domain name that incorporates a trademark is 'confusingly similar to' that mark if 'consumers might think that [the domain name] is used, approved, or permitted' by the mark holder."); Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc., 161 F. Supp. 2d 1339, 1351 (S.D. Fla. 2001) ("taking of an identical copy of another's famous and distinctive trademark for use as a domain name creates a presumption of confusion among Internet users as a matter of law."). Moreover, Courts have found that slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." See Ford Motor Co. v. Greatdomains.Com, Inc., 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001) (holding "unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage, allegations that a domain name incorporates a protected mark generally will suffice"); Harrods Ltd. v. Sixty Internet Domain Names, 157 F. Supp. 2d 658, 677 (E.D. Va.2001), aff'd in part, rev'd in part, 302 F.3d 214 (4th Cir. 2002) (finding domain names adding descriptive or generic

---

silvertiffanyshop.com, sterlingtiffany.com, tiffany4ever.com, tiffany4girls.com, tiffany4u.us, tiffany7.com, tiffanya.com, tiffanyamerica.com, tiffanyandcojewelry.com, tiffany-and-co-jewelry.com, tiffanyandcooutlet.com, tiffanyandco-outlet.com, tiffanyandcooutlet.org, tiffanyandcosale.com, tiffanyandcostore.com, tiffanyboss.com, tiffanybraceletscheap.com, tiffanybuying.com, tiffanyco1837.com, tiffanyco-mall.com, tiffanyco-mall.net, tiffanycouk.com, tiffanycow.com, tiffanycows.com, tiffany-fashion.com, tiffanyforsale.com, tiffanyforu.com, tiffany-guide.com, tiffanyhere.com, tiffanyhotsale.com, tiffanyinfo.com, tiffanyinlove.com, tiffanyjewelersuk.com, tiffany-jewellery-shop.com, tiffanyjewelry.co, tiffanyjewelry1837.com, tiffanyjewelry2011.com, tiffanyjewelry2u.com, tiffanyjewelry4sale.com, tiffanyjewelryauctions.com, tiffanyjewelryforsale.com, tiffanyjewelrygift.com, tiffanyjewelrynet.com, tiffany-jewelry-on-sale.com, tiffanyjewelryonsale.org, tiffanyjewelryoutlet.com, tiffanyjewelry-outlet.com, tiffanyjewelrysale.com, tiffanyjewelrysales.com, tiffanyjewelryshops.com, tiffanyjewelrystores.com, tiffanyjewelrystyle.com, tiffanyknockoffs.com, tiffany-mine.com, tiffanynew.com, tiffanyo.com, tiffanyonlinestoreus.com, tiffanyonlineus.com, tiffanyonsale.net, tiffanyoutlet.com, tiffanyoutlet.org, tiffanyoutletcheap.com, tiffanyoverstock.com, tiffanys1837jewelry.com, tiffanysalejewelry.com, tiffanysales.org, tiffanysalesstore.com, tiffanysave.com, tiffanyselected.com, tiffany-seller.com, tiffanysforever.com, tiffanysilversale.com, tiffanysjewelryonline.com, tiffanysjewelryshop.com, tiffanysjewelryworld.com, tiffanysky.com, tiffanysocool.com, tiffanysonly.com, tiffany-sterling-silvers.com, tiffanystock.com, tiffanystore.uk.com, tiffanysupplier.com, tiffanytopsale.com, tiffanyuksale.com, tiffanyusonsale.com, tiffanywto.com, top1tiffany.com, uktiffanyonsale.com, ustiffany4sale.com, utiffany.com, wholesale-tiffany-jewellery.com, and wholesaletiffanyjewelry.net.

1  terms like "shipping" and "store" to the "Harrods" mark confusingly similar).

2       As to the issue of bad faith, the ACPA lists of nine factors for courts to consider in

3  determining whether a domain name has been registered or used in "bad faith" with an intent to

4  profit from a mark in registering or using the mark in a domain name. See 15 U.S.C. § 1125(d)

5  (1)(B)(i); Interstellar Starship Services, Ltd. v. Epix, Inc., 304 F.3d 936, 946-47 (9th 2002). The nine

6  factors are not meant to be exclusive and the Court may consider all relevant factors in making a

7  determination of bad faith. See Interstellar Starship Services, Ltd. v. Epix, Inc., 304 F.3d 936, 946-

8  47 (9th 2002) (factors are not meant to be an exclusive list; instead, "the most important grounds for

9  finding bad faith are 'the unique circumstances of the case, which do not fit neatly into the specific

10 factors enumerated by Congress'"). Ultimately, each factor addresses whether "the defendant's use

11 of the disputed domain name is legitimate -- i.e., for some purpose other than simply to profit from

12 the value of the trademark." Ford Motor Co., 177 F. Supp. 2d at 642.  An examination of the

13 relevant bad faith factors compels the conclusion that Defendants' registration and use of the pirated

14 domain names violates 15 U.S.C. § 1125(d).

15       The first two factors, § 1125(d)(1)(B)(I) and (III), are clearly present inasmuch as Defendants

16 have no rights in the Tiffany Marks and Defendants have never used those Marks in connection with

17 a bona fide, that is, non-infringing, offering of goods or services. Moreover, Tiffany has used at least

18 one of the relevant Tiffany Marks in commerce since long before Internet domain names existed at

19 all. (See Costello Decl. ¶ 4 and Exhibit A thereto, Tiffany Trademark Registrations.) Thus, the first

20 and third statutory factors weigh heavily in favor of Tiffany.

21       Additionally, as discussed above, Defendants have clearly intentionally incorporated the

22 Tiffany Marks in their domain names to divert consumers looking for Tiffany's website to their own

23 websites for commercial gain. Such consumers are likely to be confused as to the source and

24 sponsorship of Defendants' Websites and mistakenly believe the websites are endorsed by and/or

25 affiliated with Tiffany. This is especially true in light of the fact Defendants' Websites are offering

26 for sale counterfeit Tiffany goods. (Costello Decl. ¶¶ 9-15 and Defendants' Websites attached as

27 Composite Exhibit B thereto; Tanori Decl. ¶ 4 and Composite Exhibit A attached thereto.) Clearly,

28

1   Defendants' use is anything but a bona fide noncommercial or fair use of the Tiffany Marks. In fact,

2   Defendants' registration of domain names in order to sell and offer for sale counterfeit Tiffany

3   goods, knowing the domain names are identical or confusingly similar to Tiffany's indisputably

4   famous and distinctive marks, ensured a likelihood of confusion among consumers. See House

5   Judiciary Committee Report on H.R. 3028, H.R. Rep. No. 106-412 p. 13 (October 25, 1999) ("The

6   more distinctive or famous a mark has become, the more likely the owner of that mark is deserving

7   of the relief available under this act."). Thus, the fourth, fifth, and ninth statutory factors also weigh

8   in favor of Tiffany and Tiffany has shown a likelihood of success on the merits of its cyberpiracy

9   claim.

10              **2.      Tiffany is Suffering Irreparable Injury.**

11          As the Ninth Circuit has expressed it: "[O]nce the Plaintiff in an infringement action has

12   established a likelihood of confusion, it is ordinarily presumed that the Plaintiff will suffer

13   irreparable harm if injunctive relief does not issue." Rodeo Collection, Ltd. v. West Seventh, 812

14   F.2d at 1220. Such a finding of irreparable injury following a showing of likelihood of confusion is

15   virtually always made in a case such as this, where the Plaintiff has demonstrated it will lose control

16   of its reputation as a result of Defendants' activities. See Malaytex USA Inc. v. Colonial Surgical

17   Supply Inc., 44 U.S.P.Q.2d 1291, 1295 (N.D. Cal. 1997) ("Once the plaintiff has established a

18   likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if

19   injunctive relief is not granted. In the instant case, the plaintiff will suffer irreparable injury in the

20   form of loss of valuable goodwill and reputation."). See also Metro Pub., Ltd. v. San Jose Mercury

21   News, 987 F.2d 637, 640, 25 U.S.P.Q. 2d 2049, 2051 (9th Cir. 1993).

22          As demonstrated above, a likelihood of consumer confusion exists herein, because

23   Defendants are engaged in continuous counterfeiting activities using spurious designations, which

24   are substantially indistinguishable from the Tiffany Marks. Thus, Tiffany continues to suffer

25   irreparable injury to its reputation and goodwill for as long as Defendants are allowed to continue

26   their counterfeiting and false association activities.  (Costello Decl. ¶ 19.)

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE*
APPLICATION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
234292.1

### 3. The Balance of Hardship Tips Sharply in Tiffany's Favor.

Tiffany has expended substantial time, money and other resources to develop the quality, reputation and goodwill associated with the Tiffany Marks and the genuine goods sold under such Marks. (Costello Decl. ¶¶ 6-7.) Should Defendants be permitted to continue their trade in counterfeit goods using the Tiffany Marks, Tiffany will suffer substantial losses and damage to its reputation. To the contrary, Defendants will suffer no legitimate hardship in the event a temporary restraining order and a preliminary injunction are issued, because Defendants have no legal or equitable right to engage in their present counterfeiting and false association activities nor to deprive Tiffany of its right to fairly compete in the Internet marketplace.

### 4. The Relief Sought Serves the Public Interest.

Defendants are engaging in criminal activities and are directly defrauding the consuming public by palming off Defendants' Goods as genuine goods of Tiffany. Moreover, Defendants are falsely identifying Tiffany as the origin of such goods. The public has an interest in not being misled as to the origin, source or sponsorship of trademarked products. See e.g., U.S. Olympic Committee v. Xclusive Leisure & Hospitality Ltd., 2008 WL 3971120, at *10 (N.D. Cal. 2008). See also Phillip Morris USA Inc. v. Shalabi, 352 F. Supp. 2d 1067, 1075 (C.D. Cal. 2004) (citing Inwood Labs., Inc. v. Ives Labs. Inc., 456 U.S. 844, 854 n.14, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ("It is well established that trademark law protects not only the private interests of the trademark owner but also the public's interest in not being confused by the infringing products.")).

### C. The Equitable Relief Sought is Appropriate.

The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark …" 15 U.S.C. § 1116(a).

### 1. A Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Illegal Use of the Tiffany Marks is Appropriate.

Tiffany requests an order requiring Defendants immediately cease all use of the Tiffany Marks, or substantially similar marks, including on or in connection with all Internet websites and

22

domain names owned and operated, or controlled by them. Such relief is necessary to stop the ongoing harm to Tiffany's marks and goodwill and to prevent Defendants from continuing to benefit from the increased traffic to their operations created by their illegal use of the Tiffany Marks. Many courts have authorized immediate injunctive relief in cases involving the unauthorized use of trademarks. See e.g., Kraft Foods Holdings, Inc. v. Helm, 205 F. Supp. 2d 942, 956 (N.D. Ill. 2002) (granting preliminary injunction requiring defendant "immediately" to remove all references to version of plaintiffs mark, including removing all references "from any metatags, metanames, or any other keywords on his websites); Ford Motor Company v. Lapertosa, 126 F. Supp. 2d 463 (E.D. Mich. 2001) (defendant enjoined from "using in any way the Internet domain name "fordrecalls.com").[7]

### 2. Entry of an Order Prohibiting Transfer of the Domain Names During the Pendency of this Action is Appropriate.

To preserve the status quo, Tiffany seeks an order temporarily modifying control of and prohibiting Defendants from transferring the Subject Domain Names to other parties. Under the operating rules of domain name registrars, defendants involved in domain name litigation easily can, and often will, change the ownership of a domain name and thereby frustrate the court's ability to provide relief to the plaintiff. (Gaffigan Decl. ¶ 5.) Moreover, defendants can and often do modify website content to thwart discovery and redirect traffic to thwart effective injunctive relief. (Gaffigan Decl. ¶¶ 6-7 and Composite Exhibit C attached thereto.) Accordingly, to preserve the status quo and ensure the possibility of eventual effective relief, courts in trademark cases involving domain names regularly grant such relief. See e.g., Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 1004 (N.D. Cal. 2006) (prohibiting defendants "from using, selling, licensing, or transferring the domain name"); Gaffigan v. Does 1-10, Case No. 09-cv-61206-JAL (S.D. Fla. Sept. 11, 2009) (prohibiting the defendant from transferring domain names during pendency or until further Order of the Court);

---

[7] See also Chanel, Inc. v. Qi, Case No. 3:11-cv-00362-CRB (N.D. Cal. Jan. 27, 2011) (Order granting Ex Parte Application for Temporary Restraining Order); Affliction Holdings, LLC, Inc. v. Chen, Case No. 10-cv-00933-VRW (N.D. Cal. March 15, 2010) (same); Chanel, Inc. v. Paley, Case No. 09-cv-04979-MHP (N.D. Cal. Oct. 26, 2009) (same); Chanel, Inc. v. Dodd, Case No. 09-3958-VRW (N.D. Cal. Sept. 4, 2009) (same).

1    Chanel, Inc. v. Qi, Case No. 3:11-cv-00362-CRB (N.D. Cal. Jan. 27, 2011) (same). Here, an interim

2    order prohibiting Defendants from transferring the Subject Domain Names poses no burden on them,

3    preserves the status quo, and ensures that this Court, after fully hearing the merits of this action, will

4    be able to afford Tiffany full relief.

5    　　　　Because the domain name Registrars exercise effective control over whether domain names

6    can be transferred, the Lanham Act explicitly provides for Registrars to deposit domain name

7    certificates with the court, thereby recognizing the court's control over use of the domain names. See

8    15 U.S.C. § 1114(2)(D); 15 U.S.C. § 1125(d)(2)(C); Philip Morris USA, Inc. v. Otamedia Ltd., 331

9    F. Supp. 2d 228, 230 (S.D.N.Y. 2004) (affirming registrar's decision to deposit certificate with court

10   where registrant used web site to make infringing sales). See also  Toys "R" Us, Inc. v. Akkaoui,

11   1996 WL 772709 (Oct. 29, 1996 N.D. Cal.) (noting that registrar, by delivering certificate to the

12   Court, had "delegated complete control regarding the disposition of the registration and use of the

13   domain name"). By this mechanism, the parties, and this Court, are assured that the ownership of the

14   domain names will not change while the action is proceeding. Accordingly, Tiffany also seeks an

15   interim order requiring Defendants' registrars for the Subject Domain Names to deposit domain

16   name certificates with the Court.

17   　　　　　　　**3.**　　　**Entry of an Order Modifying Control, Redirecting, and Disabling the**

18   　　　　　　　　　　　**Subject Domain Names is Appropriate.**

19   　　　　In domain name trademark cases, courts recognize that an interim order redirecting,

20   transferring, disabling, or canceling the offending domain names often may be the only means of

21   affording plaintiff interim relief that avoids irreparable harm. See e.g., Bd. of Directors of Sapphire

22   Bay Condominiums West v. Simpson, 129 Fed. Appx. 711 (3rd Cir. 2005) (affirming District

23   Court's grant of the preliminary injunction ordering defendant to "cancel his registration of the

24   domain name and refrain from using the name, or any derivative thereof, for any Web site under his

25   ownership or substantial control"); Ford Motor Company v. Lapertosa, 126 F. Supp. 2d at 468

26   (preliminary injunction issued ordering the transfer of the domain name at issue to plaintiff pending

27   resolution on the merits); Bottega Veneta Intern. v. Pan, 2011 WL 31082 (S.D. Fla. Dec. 9, 2010)

28

(preliminary injunction issued ordering that the top-level domain (TLD) Registry for the domain change the registrar of record to a holding account with the United States based Registrar GoDaddy.com, Inc.; also ordering that the Registrar set the domains to redirect to plaintiff's publication website and thereafter placing domain on lock status, preventing the modification or deletion of the domain by the registrar or the defendant).[8]

Accordingly, in order to gain control of, disable, and redirect the Subject Domain Names, Tiffany requests the Court enter an order requiring the Registries which maintain the Top Level Domain ("TLD") Zone files for the Subject Domain Names change the registrar of record for the Subject Domain Names to a holding account with the United States based Registrar GoDaddy.com, Inc., where they will be held in trust for the Court during the pendency of this action and set to automatically redirect to http://www.servingnotice.com/off/index.html.[9] Upon such redirection, a

_____

[8] See also Chanel, Inc. v. Qi, Case No. 3:11-cv-00362-CRB (N.D. Cal. Jan. 27, 2011) (temporary restraining order entered ordering that the top-level domain (TLD) Registries for the domains change the registrar of record to a holding account with the United States based Registrar GoDaddy.com, Inc.; also ordering that the Registrar set the domains to redirect to plaintiff's publication website and thereafter placing domains on lock status, preventing the modification or deletion of the domains by the registrars or the defendant); Louis Vuitton Malletier, S.A. v. Li, Case 0:11-cv-60611-WPD (S.D. Fla. March 28, 2011) (same); Chanel, Inc. v Li, Case 0:11-cv-60417-WPD (S.D. Fla. March 3, 2010) (same); Abercrombie & Fitch Trading Co v. Wu, Case 11-cv-00042-MSD–TEM (E.D. Va. Jan. 21, 2011) (same); Tiffany (NJ) LLC v. Wang, Case No. 2:10-cv-00624-RBS-FBS (E.D. Va. Jan. 4, 2011) (same); Gucci America, Inc. v. Ling, Case 2:10-cv-00591-MSD-DEM (E.D. Va. Dec. 23, 2010) (same); Tiffany (NJ), LLC v. Keresy, Case 0:10-cv-62245-JAL (S.D. Fla. Dec. 2, 2010) (same); Gucci America, Inc. v. Liu, Case 0:10-cv-62187-JAL (S.D. Fla. Nov. 24, 2010) (same); Chanel, Inc. v Does 1 -172, Case No. 2:10-cv-02684-BBD-dkv (W.D. Tenn. November 4, 2010) (same); Chanel, Inc. v. Ling, Case 2:10-cv-00489-MSD-DEM (E.D. Va. Oct. 7, 2010) (same); Louis Vuitton Malletier, S.A. v. Lin, Case 0:10-cv-61640-PCH (S.D. Fla. Sept. 13, 2010) (same); Chanel, Inc. v. Cai, Case 2:10-cv-02639-BBD-dkv (W.D. Tenn. Sept. 3, 2010) (same).

[9] Such relief regarding a change of registrars was most recently granted in Such relief regarding a change of registrars was most recently granted in Bottega Veneta International, S.A.R.L., v. Pan, 2011 WL 31082 (S.D. Fla. Dec. 9, 2010); Louis Vuitton Malletier, S.A. v. Li, Case 0:11-cv-60611-WPD (S.D. Fla March 28, 2011); Chanel, Inc. v Li, Case 0:11-cv-60417-WPD (S.D. Fla. March 3, 2010); Chanel, Inc. v. Qi, Case No. 3:11-cv-00362-CRB (N.D. Cal. Jan. 27, 2011); Abercrombie & Fitch Trading Co v. Wu, Case 11-cv-00042-MSD–TEM (E.D. Va. Jan. 21, 2011); Tiffany (NJ) LLC v. Wang, Case No. 2:10-cv-00624-RBS-FBS (E.D. Va. Jan. 4, 2011); Gucci America, Inc. v. Ling, Case No. 2:10-cv-00591-MSD-DEM (E.D. Va. Dec. 23, 2010); Bottega Veneta International, S.A.R.L., v. Hua, Case 0:10-cv-62335-UU (S.D. Fla. Dec. 21, 2010); Tiffany (NJ), LLC v. Keresy, Case 0:10-cv-62245-JAL (S.D. Fla. Dec. 2, 2010); Gucci America Inc., v. Liu, 10-cv-62187-JAL (S.D. Fla. Nov. 24, 2010); Chanel, Inc. v Does 1 -172, Case No. 2:10-cv-02684-BBD-dkv (W.D. Tenn. November 4, 2010); Louis Vuitton Malletier, S.A. v. Lin, Case 10-cv-61640-PCH (S.D. Fla. Sept. 8, 2010); Chanel, Inc. v. Ling, Case No. 2:10-cv-00489-MSD-DEM (E.D. Virginia Oct. 7, 2010); and Chanel, Inc. v. Cai, Case 2:10-cv-02639-BBD-dkv (W.D. Tenn. Sept. 4, 2010). (See http://servingnotice.com/pan/index.html; http://servingnotice.com/li2/index.html;

25

copy of all of the pleadings, other documents and Court orders issued in this matter will be immediately visible to Defendants the moment they type any of their own domain names into their web browser. The Subject Domain Names would remain in the legal ownership of Defendants, but they would no longer be able to display the infringing and counterfeit website content at issue in this matter. Rather, they would serve as the single most effective means of notifying Defendants of the pendency of this action and the relief sought by Tiffany and affording them and any other interested parties with an opportunity to present objections.

### D.     A Bond Should Secure the Injunctive Relief.

Because of the strong and unequivocal nature of Tiffany's evidence of counterfeiting and infringement, unfair competition, and cyberpiracy, Tiffany respectfully requests this Court require Tiffany to post a bond of no more than twenty thousand dollars ($20,000.00). The posting of security upon issuance of a temporary restraining order or permanent injunction is vested in the Court's sound discretion. Fed. R. Civ. P. 65(c).   The requested bond amount was recently approved as sufficient in an identical case seeking identical relief filed on behalf of Chanel, Inc., Chanel, Inc. v Does 1 -172, Case No. 2:10-cv-02684-BBD-dkv (W.D. Tenn. November 4, 2010). John Mascio v. Public Employee Retirement System of Ohio, 160 F. 3d 310, 313 (6th Cir. 1998); Rathman Group v. Tanenbaum, 889 F.2d 787, 789 (8th Cir. 1987); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411 (4th Cir. 1999).

///

///

///

///

///

---

http://servingnotice.com/li/index.html; http://servingnotice.com/qi/index.html;
http://servingnotice.com/wu/index.html; http://servingnotice.com/wang/index.html;
http://servingnotice.com/ling2/index.html; http://servingnotice.com/hua/index.html;
http://servingnotice.com/keresy/index.html; http://servingnotice.com/liu/index.html;
http://servingnotice.com/oft/index.html; http://servingnotice.com/lin/index.html;
http://servingnotice.com/ling/index.html; and http://servingnotice.com/cai/index.html.)

26

---

IV.     **CONCLUSION**

In view of the foregoing, Tiffany respectfully requests this Court enter a temporary restraining order in the form submitted herewith and set a hearing regarding Tiffany's preliminary injunction before the expiration of the temporary restraining order.

Dated: April 18th, 2011.                  Respectfully submitted,


By: /s/ David S. Kahn_____
    David S. Kahn
    J. Scott Burris
    Juan P. Rodriguez
    WILSON, ELSER, MOSKOWITZ,
    300 South Fourth Street, 11th Floor
    Las Vegas, NV  89101
    (702) 382-1414; FAX (702) 382-1413
    David.Kahn@wilsonelser.com
    J.Scott.Burris@wilsonelser.com
    Juan.Rodriguez@wilsonelser.com

    *Of Counsel:*

    Stephen M. Gaffigan (*Pro Hac Vice* pending)
    STEPHEN M. GAFFIGAN, P.A.
    401 East Las Olas Blvd., Suite 130-453
    Ft. Lauderdale, Florida 33301
    Telephone: (954) 767-4819
    Facsimile: (954) 767-4821
    stephen@smgpa.net
    *Attorneys for Plaintiff TIFFANY (NJ), LLC.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE*
APPLICATION FOR ENTRY OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
234292.1